No. 23-2669

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

JOSE MONTANEZ,

Plaintiff-Appellant,

v.

PAULA PRICE, et al.,

Defendants-Appellees.

On Appeal from the U.S. District Court
for the Middle District of Pennsylvania,
No. 3:22-CV-01267, Hon. Robert D. Mariani

## APPELLANT'S OPENING BRIEF

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW
  #26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF THE CASE ...............................................................1

SUMMARY OF ARGUMENT...............................................................9

STANDARD OF REVIEW ..................................................................10

ARGUMENT........................................................................................11

    I.   Montanez Stated a Claim Under the ADA ........................................11

      a)  Montanez was denied meaningful access to prison services .............12

      b)  Defendants were deliberately indifferent to disability discrimination.............18

    II.   The District Court Erred in Dismissing Montanez's Eighth Amendmetn
Claims .................................................................................................21

    III.  Even Were This Court to Agree with the District Court's Conclusions,
Montanez Should Be Given the Opportunity to Amend ...........................26

CONCLUSION.....................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697 (10th Cir. 2014) ....................10

*Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) ..................................14

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) .................................................12

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) ...................................14

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015) ..............................................................24

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014)...............................10

*Dinkins v. Corr. Med. Servs.,* 734 F.3d 633 (8th Cir. 2014) .....................................................16

*Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199 (3d Cir. 2008) ..................................................................................................................................11

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) ...................................................... 10, 22

*Estelle v. Gamble*, 429 U.S. 97 (1976) ....................................................................................21

*Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019) ...................... 12, 16, 19

*Gaston v. Coughlin*, 249 F.3d 156 (2d Cir. 2001) ..................................................................24

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) .........................................................................24

*Gordon v. Kartri Sales Co.*, No. 3:17-CV-00320, 2018 WL 1123704 (M.D. Pa. Mar. 1, 2018) ..................................................................................................................................27

*Haberle v. Troxell*, 885 F.3d 170 (3d Cir. 2018) ....................................................................11

*Iseley v. Beard*, 200 F. App'x 137 (3d Cir. 2006) ...................................................................15

*LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972) ............................................................24

*Long v. Wilson*, 393 F.3d 390 (3d Cir. 2004)..........................................................................26

*Matthews v. Pennsylvania Dep't of Corr.*, 827 F. App'x 184 (3d Cir. 2020) .........................20

*Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)..........26

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003) ...................................25

*Niculcea v. Stone Ridge Towne Ctr.*, No. 1:17-CV-2096, 2020 WL 6800448 (M.D. Pa. Nov. 19, 2020) ...................................................................................................................28

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) .................................................................12

*Pierce v. Cnty. of Orange*, 526 F.3d 1190 (9th Cir. 2008) ............................................... 14, 15

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248 (3d Cir. 2013) ......... 11, 18, 20

*Shorter v. United States*, 12 F.4th 366 (3d Cir. 2021) ..................................................... 10, 22

*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001) ............................................................13

*Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001) ....................................................10

*Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004) ............................................................ 21, 26

*Taylor v. Riojas*, 592 U.S. 7 (2020) ............................................................................24

*Tennessee v. Lane*, 541 U.S. 509 (2004) ......................................................................13

*Trackwell v. United States*, 472 F.3d 1242 (10th Cir. 2007) ..................................................10

*United States v. Georgia*, 546 U.S. 151 (2006) ........................................................ 15, 16, 17

*Wright v. New York State Department of Corrections*, 831 F.3d 64 (2d Cir. 2016) ......... 13, 18

*Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992) ............................................................24

## STATUTES

28 U.S.C. § 1331 .........................................................................................................1

29 U.S.C. § 794(b) ......................................................................................................12

## OTHER AUTHORITIES

28 C.F.R. § 35.152(b)(3) ...........................................................................................16

28 C.F.R. Pt. 35, App. A ...........................................................................................16

Fed. R. Civ. P. 15(a) ..................................................................................................26

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Jose Montanez appeals from an order of dismissal entered August 23, 2023, by the U.S. District Court for the Middle District of Pennsylvania. App. 3. The district court had subject-matter jurisdiction over his claims under 28 U.S.C. § 1331. In accordance with Federal Rule of Appellate Procedure 4(a), a timely notice of appeal was filed on August 30, 2023. App. 1. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in dismissing Montanez's disability law claims.

II.   Whether the district court erred in dismissing Montanez's Eighth Amendment claims.

III.  Whether the district court erred in not granting Montanez leave to amend his complaint.

## STATEMENT OF RELATED CASES

To counsel's knowledge, this case has not been before this Court previously. Counsel is not aware of any cases or proceedings that are in any way related, completed, pending, or about to be presented before this court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

On August 28, 2021, while in his cell at SCI-Huntington, Jose Montanez stood up to walk to the bathroom and crumpled to the floor. App. 36. Suddenly, and for no

apparent reason, his body had become numb from his chest to his feet. App. 37. Montanez could not stand, much less walk, and he called out to a nearby guard. *Id.* Two guards came to his door and instructed him to drag his body to the door of his cell. *Id.* Only after forcing him to drag his lower body across the floor did correctional staff help transport him to the medical unit. *Id.*

Once in the medical unit, Nurse Melanie Wagman took Montanez's vitals and "felt around" his legs. *Id.* She then called Dr. Mahli on the phone and told Montanez that he had directed her to move Montanez from his cell on the third tier of the prison to a first-tier cell, stating that he would assess Montanez the following day. App. 38. Upon being informed that he would not receive any further treatment for his sudden loss of the use of over half of his body, Montanez asked to be taken to the hospital. *Id.* Nurse Wagman refused to entertain this request, stating "you're not going to the hospital." *Id.* Montanez did not receive any additional medical treatment or testing that day. *Id.* Instead, Nurse Wagman transported Montanez by wheelchair to a cell on the first tier and instructed him to "get out of the wheelchair" at the door. *Id.* Exhausted and in extreme pain, Montanez again had to drag his paralyzed body across the cell's floor to the bed. *Id.*

The following day, Dr. Mahli came to the door of Montanez's cell. *Id.* He never entered Montanez's cell to examine him, instead remaining on the opposite side of the cell bars. *Id.* He told Montanez to walk for him. *Id.* Still unable to walk, Montanez again dragged his body across the filthy floor. *Id.* Montanez also alerted Dr. Mahli that he

could not stop himself from urinating on himself. *Id.* Dr. Mahli nodded and walked away. *Id.*

Montanez spent the following three days alone in his cell, paralyzed and urinating on himself. App. 39, 43.

On August 31, 2021, Montanez was transported to a hospital and given an MRI. App. 39. He was diagnosed with spinal cord stenosis and spinal cord edema. *Id.* He underwent surgery on September 10, 2021, and was then transferred to a rehabilitation facility, where he stayed for only fifteen days. *Id.* While still in the early stages of recovery—unable yet to stand on his own—Montanez was removed from the rehabilitation facility and transferred back to prison, this time to the infirmary at SCI-Rockview. *Id.*

Montanez was further denied necessary care at the SCI-Rockview infirmary. *Id.* Montanez fell while in the infirmary, causing a herniated disk. *Id.* The doctor attending to his care, Dr. Preston, denied Montanez adequate pain treatment for both his post-surgical pain and his injuries from this fall. *Id.* An x-ray was taken after the fall, but R. Ellers, the prison's healthcare administrator, lied about the results, delaying his treatment. *Id.*

On November 12, 2021, Montanez was transferred back to SCI-Huntington. *Id.* He submitted a number of requests for accommodation of and treatment for his spinal injury, including a double mattress to control his back pain while sleeping, a cane or crutches to facilitate walking, stronger pain medication, and access to a physical therapy

clinic. App 39–40. His requests were denied by prison officials Gabrielle Nally and Paula Price. *Id.* Prison staff again refused to provide Montanez with accommodations and medical treatment when he was later housed in the infirmary. *Id.* Montanez again requested a double mattress and pain medication, as well as an MRI to assess hip pain. *Id.* All of these requests were denied by Dr. Edwards. *Id.*

On August 12, 2022, Montanez filed a *pro se* lawsuit concerning these events in the United States District Court for the Middle District of Pennsylvania, arguing that Defendant-Appellees had violated the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and the Eighth Amendment. App. 4, 7. On January 27, 2023, he filed an amended complaint. App. 33–41. Montanez filed his amended complaint on the Middle District of Pennsylvania's "Form to be used by a prisoner in filing a civil rights complaint." App. 33. This form provides one-half of a page for *pro se* litigants to write their "Statement of Claim," and instructs that they may attach "no more than three extra sheets," in order to include additional allegations. App. 36. Montanez did just this, providing exactly three extra pages with additional details. App. 38–40

On February 10, 2023, Appellees moved, in two different motions, to dismiss Montanez's amended complaint. On April 28, 2023, Montanez filed two oppositions to these motions to dismiss. App. 47–78; App. 79–104. In his oppositions, which total over fifty pages, Montanez includes additional factual allegations about the ordeal he has endured since he suddenly paralyzed in 2021. *Id.*

First, Montanez further explained the pain and indignity he suffered when he became paralyzed and was abandoned for three days in his cell at SCI-Huntington. App. 50–51. He wrote that when Nurse Wagman first took him to his cell and made him drag himself across the "filthy" cell floor, she commented "Oh God! Stop faking it!" App. 90. This episode caused Montanez so much physical pain and emotional embarrassment that he wept when Nurse Wagman left. *Id.*

During the three-day period he was alone in the cell, Montanez lost control of his bladder and was involuntarily urinating on himself. App. 50–51. To clean himself and his soiled clothing after these accidents, Montanez had to crawl across his cell to the sink which caused "excruciating pain in his back and neck." App. 50. Crawling in this manner was also his only means to access meals left at his door. *Id.* Because he was unable to stand, he could only access the sink by grabbing at the stained, unsanitary toilet next to it and hoisting his upper body to the edge of the sink. *Id.* While trying to wash his soiled underwear in this precarious position, Montanez fell and injured himself multiple times. *Id.*

When Dr. Mahli visited Montanez one day into this three-day period, Montanez alerted the doctor to both his incontinence and his "extreme pain." App. 51. Montanez filed grievances and appeals that made SCI-Huntington Superintendent Rivello aware of the treatment he received in these first days of his paralysis. App. 82–83.

Second, Montanez provided additional details about his treatment in the infirmary unit at SCI-Rockview. App. 54–55. Montanez explained that he was

discharged from the rehabilitation facility he was housed in after surgery when he was still using a wheelchair and could not walk. App. 54; *see also* App. 96 (alleging that Paula Price approved this discharge). Shortly after arriving at the infirmary unit, Montanez pressed a nursing assistance button to seek help getting to the toilet. App. 54. A nurse responded, reprimanded Montanez for pressing the button, instructed him only to use it in emergencies, and told him he would "have to do the best he could" to get to the toilet "on his own." *Id.* Montanez reminded the nurse he was paralyzed, and she responded by throwing her hands up in the air. *Id.*

Because no medical staff would help Montanez to or from the toilet in his cell, he fell several times trying to hoist himself from his bed to his wheelchair unassisted, injuring his hip and elbow. App. 55. Montanez raised this bathroom access issue with Dr. Preston as well, who also told him he would have to "do the best he could" to access the toilet on his own. *Id.* One night, Montanez attempted to make his way to the toilet with the help of a walker, but his legs gave out and he took a hard fall to the floor, suffering a herniated disc. App. 63–64. Montanez clarified that Medical Director Ellers told him that the results of an x-ray taken after this fall were "negative," but Montanez later learned, after leaving SCI-Rockview, that the x-ray showed the herniated disc. App. 99–100. Throughout his stay at SCI-Rockview, Dr. Preston denied Montanez's requests for treatment, including a higher dose of pain medication, similar to what he had previously received at the rehabilitation center, and someone to help him complete his

physical therapy exercises. App. 55, 65. Montanez remained in considerable pain throughout his time in SCI-Rockview's infirmary. App. 55, 64.

Third, Montanez makes additional allegations about his experience at SCI-Huntington after he returned from the SCI-Rockview infirmary. App. 66–68. Montanez requested several accommodations at SCI-Huntington to ease his pain and suffering and to make services and programs within the prison accessible, including a double mattress, and either a housing assignment in the D-Max unit (where his meals and medications would have been brought to him in his cell) or a medical bedrest or lay-in order. *Id.* All of these accommodations were denied. App. 66–67. Montanez was transferred back to general population, where he had to walk "up and down the long tiers," which he still could not do "properly" nor without considerable pain to access prison services and programs, including meals, the medication line, sick call, the medical department, and the yard. *Id.* At night, Montanez had to sleep on a thin mattress laid over steel bars that aggravated his hip, neck, and back pain. App. 66. Montanez allegef that Nurse Nalley denied these requests and failed to provide him with appropriate alternative accommodations. *Id.* at 66, 67, 69.

Montanez also explained that he was forced to move all of his belongings from D-Max, where he was housed for the first two weeks of his stay at SCI-Huntington, to general population, by packing them into and pushing a large cart. App. 66–67. Montanez lacked the physical strength and mobility to do this, and it caused him significant pain. App. 67. No staff helped him. *Id.* When Montanez was later transferred

7

from general population to SCI-Smithfield, he was again made to pack up and transport all of his own belongings without accommodation or assistance. *Id.*

Fourth, Montanez included allegations about his treatment at the SCI-Smithfield infirmary, where he was transferred on December 14, 2021. App. 71. Here, Montanez told Dr. Edwards about his "extreme" pain while sleeping and asked for a double mattress or to be moved to an available hospital bed. *Id.* at 71, 72, 74. Dr. Edwards asked Montanez if he had received a double mattress at his prior institution, Montanez truthfully said no, and Dr. Edwards denied the request without further inquiry. App. 71. Montanez again requested stronger pain medication and access to physical therapy, but Dr. Edwards provided him with only Tylenol and denied his physical therapy request. App. 71–72. Montanez raised this denial of medical care and lack of accommodation in grievances that went to Wakefield, Superintendent of SCI-Smithfield. App. 86–87.

On August 23, 2023, the district court granted Defendants' motions to dismiss. App. 3. The district court held that Montanez's Eighth Amendment claims against all Defendants should be dismissed because their decisions constituted good-faith disagreements on appropriate medical treatment and therefore Defendants were not deliberately indifferent. App. 12–18, 24–25. The district court further held that Montanez's disability law claims should be dismissed on the grounds that 1) Montanez did not allege that he was denied access to a program, service or activity, and (2) Montanez did not show that defendants acted with deliberate indifference. App. 19–

21, 27–28. Further, the district court held that providing Montanez leave to amend would be futile. App. 29–30. On August 31, 2023, Montanez timely filed a notice of appeal. App. 1.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Montanez's disability law claims. First, the district court erred in holding that Montanez did not allege a prison service to which he lacked meaningful access. Montanez alleged a failure to accommodate his access to bedding, toileting, health care, and mobility, each of which would be sufficient to state a claim under the ADA. Second, the district court erred by conflating deliberate indifference in the disability law context with deliberate indifference in the Eighth Amendment context. Although the *mens rea* standard is the same, the underlying substantive right is different, and Montanez alleges numerous times that Defendants were on notice of his need for an accommodation and disregarded it.

The district court also erred in dismissing Montanez's Eighth Amendment claims. This Court has long held in a variety of contexts that medical officials who are aware of and disregard serious medical needs are deliberately indifferent under the Eighth Amendment. The district court's holding that every allegation of misconduct is merely a good-faith disagreement on the appropriate treatment is conclusory—nothing in Montanez's allegations support the conclusion that Defendants were acting out of their medical judgment and, indeed, much of Montanez's complaint directly contradicts it.

Finally, the district court erred in not granting Montanez leave to amend. Leave to amend should be granted freely unless doing so would be futile, and here Montanez's detailed allegations in his oppositions to Defendants' motions to dismiss make clear that amendment would not be. This Court should reverse and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss *de novo*. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014). When reviewing a district court's grant of a motion to dismiss, this Court "must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (internal quotation marks omitted) (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)). Because Montanez proceeded *pro se* before the district court, his submissions to the district court must be construed "liberally" and held to "less stringent standards than formal pleadings drafted by lawyers." *Shorter v. United States*, 12 F.4th 366, 371 (3d Cir. 2021) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

## ARGUMENT

### I.    Montanez Stated a Claim Under the ADA.[1]

"[T]he ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society, and as such, it must be broadly construed to effectuate its purposes." *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008) (internal quotations and citations removed). To successfully state a claim under Title II of the ADA, a person "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018). To obtain compensatory damages under the ADA, a plaintiff must also demonstrate deliberate indifference, "requiring both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013).

The district court held that Montanez did not state an ADA claim against Defendants in their official capacities for two reasons. First, it held that Montanez did not assert that "he was excluded from participating in any programs, services, or activities." App. 21. Second, it held that Defendants were not deliberately indifferent

---

[1] Because the ADA and the Rehabilitation Act are coextensive for all purposes relevant to this appeal, Montanez uses "the ADA" as shorthand to refer to both claims.

under the ADA because Defendants "did not demonstrate deliberate indifference to Montanez's medical needs" under the Eighth Amendment and the two standards should be read in lockstep. App. 21–22. Both bases for dismissal were in error.

**a) Montanez was denied meaningful access to prison services.**

"[P]rograms, services, and activities" has an expansive meaning in the unique context of prisons, in which public entities have control over all actions of the prisoners in their charge. The Rehabilitation Act, which this Court interprets coextensively with the ADA, expressly defines "program or activity" to mean "all of the operations of … a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b); *see also Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019) (noting that this Court interprets Rehabilitation Act and ADA claims in lockstep). In the context of prisons and jails, "programs, services, and activities" includes virtually everything the facility offers, from dining to visitation to educational programming. *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (holding that "the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication" inside a prison all constitute a public entity's programs or services); *Furgess*, 933 F.3d at 289 (citing *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015)) (holding that the definition of "service, program, or activity is "extremely broad in scope and includes anything a

public entity does," and thus the "operations of" a prison, including showers, fall within this definition).

Meaningful access requires more than being physically capable of accessing services when doing so risks injury, pain, or humiliation. "A violation of Title II … does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. The regulations specifically require that services, programs, and activities be 'readily accessible.'" *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (quoting 28 C.F.R. § 35.150). In *Wright v. New York State Department of Corrections*, for example, a wheelchair-bound plaintiff was able to use a manual wheelchair to access services but it caused him pain, so the Second Circuit held that banning him from using a motorized wheelchair violated the ADA. 831 F.3d 64, 70 (2d Cir. 2016). This Court in *Furgess v. Pennsylvania Department of Corrections* ruled in favor of a plaintiff in a wheelchair who at first was given no showers at all and then was given a shower he could access but not safely. 933 F.3d at 292. This Court held that both were part of a valid ADA claim. *Id.* ("For three months, the PDOC did not provide him with any accommodation that would allow him to shower; when they did bring him to a shower, it was not handicapped-accessible.")

The U.S. Supreme Court's paradigmatic Title II case, *Tennessee v. Lane*, involved plaintiffs with mobility impairments who had to crawl or be carried up flights of stairs to reach the second floor of a courthouse. 541 U.S. 509, 513 (2004). No party suggested that the plaintiffs had meaningful access to the courts even though they could physically

reach them by risking injury and humiliation. Congress in passing the ADA enacted a broader mandate for equality. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (rejecting defendant's argument that it must only provide "necessary" accommodations as that "would require very few accommodations indeed. After all, a paraplegic *can* enter a courthouse by dragging himself up the front steps, so lifts and ramps would not be 'necessary' … And no facility would be required to provide wheelchair-accessible doors or bathrooms, because disabled individuals could be carried in litters or on the backs of their friends. That's not the world we live in.").

Even in Montanez's necessarily truncated complaint, he alleged a number of services for which he was denied meaningful access. During his first stay at FCI-Huntington, he alleged a lack of "meaningful access" to both toileting and to health care. Prison staff made him drag his paralyzed body across the floor on multiple occasions in order to exit or enter his cell when going to or coming from the medical unit. App. 37–38. When he alerted a doctor that he was uncontrollably urinating on himself, the doctor merely nodded and walked away, offering no assistance or alternative way for Montanez to relieve himself in a dignified manner. App. 38.

Courts have recognized that both toileting and health care are programs, services, or activities under the ADA and RA. *See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 n.44 (9th Cir. 2008) (determining that "[p]roviding inmates with appropriate and adequate … bathroom facilities are 'services' of the jail" for purposes of the ADA); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (holding that relying

on the good graces of other prisoners to be able to access such a fundamental service like a toilet is antithetical to the Rehabilitation Act's "emphasis on independent living and self-sufficiency[, which] ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons."); *United States v. Georgia,* 546 U.S. 151, 157 (2006) (listing "medical care" as a prison service).[2]

During his second stay at FCI-Huntington, Montanez alleged a lack of meaningful access to both bedding as well as an accommodation—a cane or crutches—that would be necessary to reach many services in any prison environment by facilitating mobility. App 39–40. Because Montanez experienced back pain when sleeping on a single mattress, he requested a double mattress to accommodate his spinal condition. App. 40 He also sought a cane or crutches to help him walk. *Id.* He was denied both of these accommodations. *Id.*

Courts across the county have recognized that in the prison context, a place to sleep is a "service" within the meaning of Title II. *See, e.g., Pierce,* 526 F.3d at 1224 n.44

---

[2] Significantly, the conclusion that health care is a "service" provided by a public entity is distinct from the doctrine, cited by the district court, that prisoners may not use disability law to bring claims that more appropriately sound in medical malpractice by seeking medical care as a proposed accommodation for their disability. *See Iseley v. Beard,* 200 F. App'x 137, 142 (3d Cir. 2006). Making a paralyzed prisoner crawl to and from his medical appointments is not "medical malpractice" as it is distinct from any issues in the provision of medical care and the accommodation he sought was humane transportation, not different medical treatment. Indeed, Montanez brings deliberate indifference claims in this very case for the medical treatment of his paralysis under the Eighth Amendment and not the ADA because the former is the appropriate vehicle for challenging inadequate prison medical care.

(9th Cir. 2008) (determining that "[p]roviding inmates with appropriate and adequate bedding … facilities are 'services' of the jail" for purposes of the ADA); *Dinkins v. Corr. Med. Servs.,* 734 F.3d 633, 634–35 (8th Cir. 2014) ("[D]enial of … adequate housing by reason of [plaintiff's] disability can form the basis for viable ADA … claims."). Department of Justice regulations implementing Title II reinforce this interpretation. DOJ's regulations require that prisons "ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing." 28 C.F.R. § 35.152(b)(3). DOJ explained in releasing these regulations that "[i]t is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to … devices such as a bed transfer." 28 C.F.R. Pt. 35, App. A.

When given more space to elaborate in his oppositions to Defendants' motions to dismiss, Montanez identified additional services that he lacked meaningful access to because of his disability and Defendants' failure to accommodate it. During his first stay at FCI-Huntington, he had to crawl around in his cell, causing "excruciating pain in his back and neck," both to access the sink to clean his soiled clothes and body as well as to access the meals left at his door. App. 50–51. Both hygiene and meal service are paradigmatic services under the ADA. *See Furgess*, 933 F.3d at 290 (listing "showers" and "meals" as services under the ADA and RA); *see also United States v. Georgia*, 546 U.S. 151, 157 (listing "hygiene" as a service under Title II of the ADA).

Montanez also explained that when he was discharged to SCI-Rockview, he was still using a wheelchair and could not walk. App. 54. When he sought help from a nurse to get to his toilet, the nurse told him he would "have to do the best he could" to get to the toilet "on his own." *Id.* Montanez reminded the nurse he was paralyzed, and she responded by throwing her hands up in the air. *Id.* Because no staff would help with the transfer, Montanez fell several times trying to hoist himself from his bed to his wheelchair unassisted, in order to wheel himself to the toilet, injuring his hip and elbow. App. 55. One night, Montanez tried to make his way to the toilet using a walker, but his legs gave out and he fell, suffering a herniated disc. App. 63–64. As laid out above, toileting is a service under Title II, and, in *Georgia*, the U.S. Supreme Court cited "mobility" as a service provided to a paralyzed prisoner. 546 U.S. at 157.

Upon his return to SCI-Huntington, Montanez was denied meaningful access to several additional services, including bedding (through the denial of a double mattress), and meal service and medical care (through denial of either a housing assignment in the D-Max unit or a lay-in order so his meals and medications would be brought to him.) App. 66–68. Montanez was then transferred back to general population, where he had to walk "up and down the long tiers," which he still could not do "properly" nor without considerable pain, to access meals, the medication line, sick call, the medical department, and the yard for recreation. App. 66–67. At night, missing the double mattress, Montanez slept on a thin mattress laid over steel bars, aggravating his hip, neck and back pain. App. 66. As explained above, meals, bedding, and medical

treatment are services under the ADA; so too is recreation, *see Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 70 (2d Cir. 2016).

The district court held that "Montanez does not assert that he was excluded from participating in any programs, services, or activities." App. 21. It provided no analysis, so it is unclear why it did not consider any of the above allegations identifying prison services to which Montanez was denied meaningful access as sufficient to state a claim. It was incorrect to do so, and this Court should reverse.

**b) Defendants were deliberately indifferent to disability discrimination.**

In addition to the elements of a disability law claim, to obtain compensatory damages a plaintiff must also demonstrate deliberate indifference, "requiring both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013).

Montanez has done so. He has identified numerous Defendants who knew that there was a substantially likely risk that he was not being reasonably accommodated, but nonetheless failed to act. Nurse Wagman forced Montanez out of his wheelchair and made him drag himself across the ground to access his bed. App. 38. Dr. Mahli saw that Montanez was urinating on himself but took no actions to assist or accommodate his access to a toilet. *Id.*

When Montanez was transferred back to SCI-Huntington, he submitted numerous requests for accommodation of his spinal injury, including a double mattress

to control his back pain while sleeping and a cane or crutches to facilitate walking. App. 39–40. These requests were precisely to put Defendants on notice that he needed an accommodation.

Just as with the issue of access to services, Montanez in his oppositions to Defendants' motions to dismiss further elaborated the many ways that he put Defendants on notice of his need for accommodation. In his first stint at SCI-Huntington, he filed grievances and appeals. App. 82–83. At SCI-Rockview, he sought help from a nurse to use the toilet and she told him he had to do it on his own. App. 54–55. When he reminded her that he was paralyzed and could not do it on his own, she threw her hands up in the air and left, as straightforward a representation of deliberate indifference to disability discrimination as one could find. App. 54. He informed Dr. Preston at SCI-Rockview of his toilet issues also but received no help. App. 55. Montanez's responses to the motion to dismiss also go into further detail about his requests to receive accommodations when back at SCI-Huntington which too went ignored. App. 66–68.

This Court's opinion in *Furgess* is instructive. This Court held that defendants were indifferent to violations of disability law when a paralyzed prisoner requested an accessible shower and staff, who were aware the existing showers were not handicapped-accessible, did nothing to assist him for three months. 933 F.3d at 292. Montanez's pleas for help, his written requests for accommodation, the apparentness

of his need, and Defendants' inactions are sufficient to similarly demonstrate deliberate indifference.

The district court erred when it held that because Defendants were not deliberately indifferent under the Eighth Amendment, they were not deliberately indifferent under the ADA either, writing that Defendants "did not demonstrate deliberate indifference to Montanez's medical needs." App. 21. The district court was correct that the "definition of deliberate indifference in the RA and the ADA context is consistent with [the] standard of deliberate indifference in the context of § 1983 suits by prison inmates," citing an unpublished opinion, *Matthews v. Pennsylvania Dep't of Corr.*, 827 F. App'x 184, 188 (3d Cir. 2020), which in turn cited this Court's opinion in *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 n.23 (3d Cir. 2013). App 22. *S.H.* explained correctly that deliberate indifference has the same definition whether in the context of the Eighth Amendment, the ADA, or Title IX. *Id.* In other words, deliberate indifference is merely a mens rea—showing deliberate indifference requires showing a knowing disregard. A knowing disregard *of what* depends on the substance of the law, as the ADA is no more a carbon copy of the Eighth Amendment than Title IX is.

The question of deliberate indifference therefore turns on the substance of the underlying right, here the affirmative obligation of public entities to provide reasonable accommodations to those with disabilities. As explained above, Montanez has plausibly

alleged that Defendants were aware of his need for accommodations and disregarded them. Reversal on Montanez's disability claims is therefore appropriate.

## II.   The District Court Erred in Dismissing Montanez's Eighth Amendment Claims.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Like all Eighth Amendment conditions of confinement claims, one for inadequate medical care has an objective and a subjective component—the medical need must be objectively serious and the defendant must have treated the need with knowing disregard. This Court has held that the *Estelle* standard is satisfied when 1) prison officials deny reasonable requests for medical treatment, exposing the prisoner to undue suffering; and 2) the officials were aware that the prisoner needed treatment and refused to provide it. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

The district court erred in its analysis of Montanez's Eighth Amendment claim against Nurse Wagman. The district court held that Montanez's claim "is subject to dismissal because it amounts to a mere disagreement with medical treatment." App. 17. This is wrong on two counts—Wagman provided no medical treatment and there is no evidence of any disagreement. Wagman felt Montanez's legs, purported to call the doctor and report his statements that he would see Montanez tomorrow—although, before discovery, Montanez has no way to verify this—and then dumped him in a filthy cell. App. 37–38. She did not "treat" his sudden paralysis in any way. In addition, none

21

of Montanez's allegations support the conclusion that Wagman was acting out of a good-faith medical disagreement, certainly not as a matter of law, and operating before discovery he has had no opportunity to obtain any evidence regarding her state of mind. While Wagman too will have her opportunity to produce evidence that her action constituted a medical disagreement rather than animus or deliberate indifference, Montanez's allegations do not support that conclusion but rather the opposite. Montanez alleges that Wagman laughed at him for wanting to go to the hospital, kicked him out of his wheelchair, and made him crawl into his filthy cell like an animal. App. 38. Montanez added in his opposition that as she watched him painfully drag his paralyzed body across a filthy floor, Wagman accused him of "faking it."  App. 90.

Even were there not concrete allegations of Wagman's cruelty towards Montanez, a favorable presumption as to her mental state is incompatible with Rule 12, which requires reading allegations liberally, particularly in *pro se* complaints. *Doe*, 30 F.4th at 340; *Shorter*, 12 F.4th at 371. Were courts to assume before discovery that any decision by a medical practitioner is grounded in good-faith medical disagreement, it would obviate *Estelle* entirely.

The district court made the same error as to Dr. Mahli, writing that "Montanez simply disagrees with the Medical Defendants' medical judgment." App. 24. "Dr. Mahli treated Montanez," the district court wrote, and "did not fail to provide any medical treatment." App. 17, 24.

This analysis is a mischaracterization of Montanez's allegations. He alleged that when he suddenly found himself paralyzed, Dr. Mahli provided or ordered no treatment but instead told Nurse Wagman to let him wait in a cell until the next day. App. 38. When Dr. Mahli came to see him the following day, he never entered the cell or examined Montanez but instead asked him to walk. *Id.* Montanez, unable to walk, dragged his body across the floor. *Id.* He told Dr. Mahli that he was urinating on himself. *Id.* Dr. Mahli nodded and walked away. *Id.* There are no allegations that Dr. Mahli ever provided Montanez any medical care—while Montanez was finally taken to a hospital after three days of crawling around a dirty cell urinating on himself, there are no allegations that Dr. Mahli had anything to do with that decision. How this could possibly constitute medical treatment is unclear, and there are no allegations that Dr. Mahli's actions were motivated by a good-faith medical disagreement as to Montanez's needs.

Montanez made further allegations regarding Dr. Mahli in his opposition to Defendants' motion to dismiss. He explained that when Dr. Mahli came to his cell door the day after he first became paralyzed, he alerted Dr. Mahli not only to his incontinence but also to his "extreme pain." App. 51. He further explained that during the three-day period Dr. Mahli left him alone in his cell, he fell and injured himself multiple times trying to hoist himself up to the sink, by means of grasping at a filthy toilet, in order to clean his urine-covered body and clothing. App. 50–51.

Particularly troubling are Montanez's allegations that Dr. Mahli was aware that Montanez was uncontrollably urinating on himself but left him to do so for three days. For reasons of health, sanitation, and human dignity, courts have been particularly concerned about prison officials leaving prisoners to sit in sewage. *See Taylor v. Riojas*, 592 U.S. 7 (2020) (summarily reversing the Fifth Circuit Court of Appeals for granting qualified immunity to defendants who left a prisoner in a cell filled with sewage for six days, holding that the constitutional violation was obvious); *see also Brooks v. Warden*, 800 F.3d 1295, 1303-04 (11th Cir. 2015); *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001); *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992); *Gaston v. Coughlin*, 249 F.3d 156, 161 (2d Cir. 2001); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972). As this Court explained in *Young*, it "would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." 960 F.2d at 365. While Montanez's burden is much smaller—needing to show only plausible deliberate indifference to a serious medical need rather than a substantial risk of serious harm from the sanitation failure itself—his allegations are not much different.

The district court's conclusory statement covering all medical defendants—that Montanez merely disagrees with his medical treatment, which he was never denied— fares no better with the other medical defendants. Montanez alleges that after undergoing major spinal surgery, after which he was unable to walk, Dr. Preston denied him the proper pain medication, even after he fell and herniated a disc in his back. App.

39. He alleges that his pain and anguish was prolonged because he was given an x-ray after his fall, but a health official, R. Ellers, lied about its results and the existence of the herniated disc, which delayed him receiving treatment for it. *Id.* Upon returning to SCI-Huntington, Dr. Edwards refused to give him the pain medication that he needed and refused to provide an MRI to diagnose his back problems. App. 40. In his opposition, he alleges repeatedly that Dr. Preston, Nurse Nalley, and Dr. Edwards continuously denied him the physical therapy he needed in order to regain the ability to adequately walk. App 39–40, 55, 65, 71–72.

Defendants will have the opportunity to argue that these events either never occurred or that their motivations were differences of opinion as to the appropriate medical treatment, but a liberal reading of Montanez's complaint does not support that conclusion.

This Court has long held that learning of and ignoring serious medical needs constitutes deliberate indifference. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). This Court held in *Natale* that not providing insulin to a prisoner for the first 21 hours of his incarceration constituted deliberate indifference given defendants' awareness of his need and the potential consequences of failing to meet it. *Id.* The same holds here given that Montanez was not seen by a doctor for a day and then received no treatment for three days. Nor would the district court be justified in concluding that any medical official that did something, regardless of its adequacy, would be immune from an *Estelle* claim. *See Monmouth Cnty. Corr. Institutional Inmates v.*

*Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citing approvingly an Eighth Circuit case that held that treating a fractured hand with an ice-pack constituted deliberate indifference).

*Spruill v. Gillis* is particularly analogous. 372 F.3d 218, 237 (3d Cir. 2004). A prisoner complained of serious back pain but was not taken seriously by prison doctors, even after he injured himself in a fall. *Id.* Joined by then-judge Alito, this Court held that the plaintiff's allegations of serious back pain and defendants' failure to examine him or treat his pain adequately stated a claim. *Id.* Defendants will have the opportunity to justify their medical decisions on remand, but the district court erred in granting their motion to dismiss.

### III.    Even Were This Court to Agree with the District Court's Conclusions, Montanez Should Be Given the Opportunity to Amend.

Montanez filed his first amended complaint on the Middle District of Pennsylvania's "Form to be used by a prisoner in filing a civil rights complaint." App. 33. This form provides one-half of a page for *pro se* prisoners to write their "Statement of Claim," and instructs that they may attach "no more than three extra sheets" in order to include additional allegations. App. 36. Montanez followed the directions, providing three extra pages with additional details. App. 38–40.

As explained above, even were there any ambiguity that Montanez's original complaint stated a claim, his additional allegations leave none. Opportunities to amend should be given liberally, and these circumstances certainly qualify. Fed. R. Civ. P. 15(a); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004). The district court dealt with Montanez's

additional allegations, however, by simply noting in a footnote that "a complaint cannot be amended by way of an opposition brief." App. 8. Even if these allegations cannot amend Montanez's complaint, however, they demonstrate that potential amendment to Montanez's complaint is not futile. *Gordon v. Kartri Sales Co.*, another case from the Middle District of Pennsylvania, made exactly this point when it explained that *pro se* allegations in opposition to a motion to dismiss justified the opportunity to amend. No. 3:17-CV-00320, 2018 WL 1123704, at *3 (M.D. Pa. Mar. 1, 2018) (collecting cases from other district courts within this Court's jurisdiction reaching the same conclusion). Amendment would be particularly appropriate here given that Montanez was limited to under four pages of handwritten allegations by the Middle District of Pennsylvania's own complaint form. App. 36.

The district court itself noted that "the Third Circuit Court of Appeals has admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend unless such an amendment would be inequitable or futile." App. 29 (internal quotation marks omitted). The court nonetheless concluded, with no analysis, that amending Montanez's Eighth Amendment claims would be futile. App. 29–30. The court's only authority was this Court's conclusion that amendment was futile in a case when the plaintiff had "already had two chances to tell his story." *Id.* (quoting *Jones v. Unknown D.O.C. Bus Driver & Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019)). Montanez, however, did not have two chances to tell his story—unlike in *Jones*, his filing of a first amended complaint was not

in response to this Court's reversal of the district court to permit amendment but was Montanez's own choice to amend when he learned more information about the appropriate defendants. App. 31. The district court's conclusion of futility was therefore on its first review of a complaint bringing multiple claims against several defendants in under four handwritten pages.

Separately, the district court concluded in a footnote that granting Montanez leave to amend on his disability law claims would be futile, also with no analysis.[3] App. 7. This conclusion was also erroneous for the reasons explained above.

## CONCLUSION

For the foregoing reasons, the district court decision should be reversed and the case should be remanded.

May 1, 2024

Respectfully submitted,

/s/ *Samuel Weiss*
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW

---

[3] The district court held that allowing amendment of Montanez's ADA claim "would be futile *and* cause undue delay." App. 7 (emphasis added). The added justification for dismissal on the basis of delay is inexplicable, as the court left no claims alive in the case and therefore there was nothing that amendment could have delayed. The phrase's appearance seems to be the result of copying and pasting from other decisions from the district where amendment was denied as to some claims while others moved forward. *See, e.g.*, *Niculcea v. Stone Ridge Towne Ctr.*, No. 1:17-CV-2096, 2020 WL 6800448, at *1 (M.D. Pa. Nov. 19, 2020).

#26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume, typeface, and type-style requirements of Rule 32(a) of the Federal Rules of Appellate Procedure and Rule 32 of the 3rd Circuit Rules. This brief contains 7,431 words, excluding the parts of the document exempted by Fed. R. App. 32(f), as calculated in Version 15.26 of Microsoft Word for Mac 2016. It was prepared in 14-point font using Garamond, a proportionally spaced typeface.

/s/ *Samuel Weiss*
Samuel Weiss

## CERTIFICATE OF SERVICE

I certify that on May 1, 2024, I electronically transmitted the foregoing brief to the Clerk of the Court using the appellate CM/ECF System, causing it to be served on counsel of record, who are all registered CM/ECF users.

/s/ *Samuel Weiss*
Samuel Weiss